[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 4, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-13573

_____

D. C. Docket No. 03-03168-CV-TWT-1

RAYMOND ANTHONY MILLER,

                                        Plaintiff-Appellant,

versus

TERRY J. HARGET,
CITY OF RIVERDALE,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(August 4, 2006)**

Before EDMONDSON, Chief Judge, BIRCH and ALARCÓN,[*] Circuit Judges.

ALARCÓN, Circuit Judge:

_____

[*]Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

Raymond Miller appeals from the entry of summary judgment in favor of Officer Terry Harget of the City of Riverdale Police Department and the City of Riverdale ("the City"). Mr. Miller brought a complaint under 42 U.S.C. § 1983 against Officer Harget and the City, asserting, among other things, a violation of the Fourth Amendment arising from an encounter with Officer Harget that eventually led to Mr. Miller's arrest. The District Court concluded that Officer Harget had probable cause to stop and arrest Mr. Miller and that no constitutional violations had occurred. We conclude that the initial encounter between Mr. Miller and Officer Harget was non-coercive and that no detention triggering the protection of the Fourth Amendment occurred until Officer Harget reasonably suspected Mr. Miller of a crime. Mr. Miller's arrest was supported by probable cause. Accordingly, we affirm.

**I**

In his deposition and affidavits filed in opposition to the motion for summary judgment, Mr. Miller testified as follows. On September 30, 2001, Mr. Miller had an early dinner with two acquaintances at a Mexican restaurant near the HomeTown Inn, an extended stay hotel where Mr. Miller was living at the time. He was staying at the hotel in order to shorten his commute to work. On

2

weekends, he would stay with his family in the nearby town of Lithonia. While at the restaurant, Mr. Miller met Amy Best.

Mr. Miller and Ms. Best decided to leave the restaurant together. Because Ms. Best had been drinking, she designated Mr. Miller as the driver of her car, a '84 or '85 white Pontiac Firebird. They visited Mr. Miller's family in Lithonia, which was about twenty-five miles away. They then returned to Riverdale. They intended to stop at the HomeTown Inn, prior to Mr. Miller driving Ms. Best to her home.

Mr. Miller drove from Lithonia, without committing any traffic code violations, and entered the parking lot of HomeTown Inn. After he entered the parking lot, he drove toward the back of the building. He was hoping to park in the back, close to where his room was located. There were no spaces available, so he parked his car in front of the HomeTown Inn.

In his deposition and affidavit filed in support of his motion for a summary judgment, Officer Harget testified that he was on duty in the area around the HomeTown Inn in a marked patrol car at approximately 10:15 p.m.. He was parked in the entrance of the public storage facility near the HomeTown Inn, observing traffic. From this position, he observed the Best vehicle weave in between lanes without signaling and make an improper turn into the parking lot of

3

the HomeTown Inn. After witnessing the traffic code violations, Officer Harget decided to investigate.

Officer Harget pulled into the parking lot and parked directly behind the already parked Best vehicle. Then, Officer Harget "initialed" his "window lights" and beeped his siren to let the occupants know he was there. Officer Harget did not flash his roof lights. He got out of his car and approached the window on the driver's side.

When Officer Harget reached the front door on the driver's side, Mr. Miller, who was still seated in the vehicle, lowered the window. Officer Harget testified that when the window was lowered, he smelled alcohol immediately. He also testified that Mr. Miller's eyes were bloodshot and glassy and that there was a white, non-translucent cup in the cup-holder nearest to Mr. Miller.

Officer Harget told Mr. Miller "he was stopping [him] because [he] had made too wide a turn into the HomeTown Inn parking lot." Ms. Best responded: "You are a liar!" Officer Harget asked Mr. Miller for his driver's license. He produced it.

Mr. Miller testified that Officer Harget asked him if Ms. Best was his girlfriend. Ms. Best responded that it was none of Officer Harget's business. Mr. Miller testified that Officer Harget then asked him what he was planning to do that

4

night.  Mr. Miller responded that he was getting ready to go upstairs for a minute, come back down, and take Ms. Best home.  Mr. Miller testified that Officer Harget responded:  "Yeah, right."

Officer Harget testified that he took Mr. Miller's driver's license and insurance information back to his  patrol vehicle and performed a warrant check on Mr. Miller.  He found no warrants.  The date on the insurance card Mr. Miller provided showed that his car insurance had expired.

Because Ms. Best repeatedly called Officer Harget a liar, Officer Harget radioed for back up.  He then re-approached the Best vehicle.  Officer Harget testified that he asked Mr. Miller if he had been drinking, and that Mr. Miller admitted to having had a few beers.  In his deposition testimony, Mr. Miller denied that he made that statement or that he drank any alcohol that night.

Officer Harget asked Mr. Miller to perform a breathalyzer test, but Mr. Miller refused.  Mr. Miller testified that he refused to take the test because "Officer Harget had lied when he said I made too wide of a turn into the parking lot.  I felt that his–he would lie that I went above the limit."

Officer Harget asked Mr. Miller to step out of the car.  As he stepped out of the vehicle, Mr. Miller dropped some papers onto the floorboard of the Best vehicle. Officer Harget again asked Mr. Miller to perform a breathalyzer test.  Mr.

5

Miller again refused.  After Mr. Miller's second refusal, Officer Harget placed him under arrest.  Officer Harget informed Mr. Miller he was under arrest for DUI.  He read Mr. Miller the implied consent notice for suspects over the age of twenty-one, including the provision that a "refusal to submit to the required testing may be offered against you at trial."[1]  Mr. Miller refused to take the test required under

-------

[1]Under Georgia law,

> any person who operates a motor vehicle upon the highways or elsewhere throughout the state [is] deemed to have given consent . . . to a chemical test or tests of his or her blood, breath, urine or other bodily substances for the purpose of determining the presence of alcohol or any other drug, if arrested for any offense arising out of acts alleged to have been in violation of [Georgia's driving under the influence statute] . . .

Ga. Code Ann. § 40-5-55 (2004).  The test is to be administered "as soon as possible at the request of a law enforcement officer having reasonable grounds to believe that the person has been driving" under the influence of alcohol.  Ga. Code Ann. § 40-5-67.1 (2004).  At the time the test is requested, the officer must read the following to drivers over the age of twenty-one:

> Georgia law requires you to submit to state administered chemical tests of your blood, breath, urine, or other bodily substances for the purpose of determining if you are under the influence of alcohol or drugs.  If you refuse this testing, your Georgia driver's license or privilege to drive on the highways of this state will be suspended for a minimum period of one year.  Your refusal to submit to the required testing may be offered into evidence against you at trial.  If you submit to testing and the results indicate an alcohol concentration of 0.08 grams or more, your Georgia driver's license or privilege to drive on the highways of this state may be suspended for a minimum period of one year.  After first submitting to the required state tests, you are entitled to additional chemical tests of your blood, breath, urine, or other bodily substances at your own expense and from qualified personnel of your own choosing.  Will you submit to the state administered chemical tests of your (designate which tests) under the implied consent law?

Id. at § 40-5-67.1(b)(2).

Georgia law.  Officer Harget then escorted Mr. Miller to a patrol car and placed him in the back seat.

Other officers responded quickly to Officer Harget's call for backup. Although the other police officers dealt primarily with Ms. Best, Officer M.E. Taylor also observed Mr. Miller's condition.  Officer Taylor testified that in his opinion, Mr. Miller appeared to have been drinking.  Officer Taylor testified that Mr. Miller's eyes were glassy, his movements were lethargic, and that he smelled of alcohol.

Officer Harget testified that after placing Mr. Miller under arrest, he retrieved the white cup.  It smelled of alcohol.  Officer Harget poured out the contents of the cup and placed the cup back in Ms. Best's car.  Mr. Miller testified that there was no cup in the vehicle.

After he was arrested, Mr. Miller was transferred to the Riverdale Police Department.  He was again given the opportunity to take a state administered blood-alcohol test.  He refused.  He was issued four traffic citations:  DUI; Open Container; Improper Lane Change; and No Proof of Insurance.[2]  The Solicitor's

---

[2]Officer Harget testified that he did not recall whether he wrote the citations at the scene of Mr. Miller's arrest or at a later time.

office issued a *nolle prosequi* for the No Proof of Insurance and the DUI charge. Mr. Miller was acquitted of the remaining two charges at trial.

Following his acquittal, Mr. Miller filed a complaint in federal court against Officer Harget and the City under § 1983. He alleged that his Fourth, Sixth and Fourteenth Amendment rights were violated because he was arrested without probable cause. He also asserted state law claims for false arrest and malicious prosecution.

The District Court entered summary judgment in favor of Officer Harget and the City of Riverdale. Mr. Miller has timely appealed from the District Court's final judgment.[3]

## II

## A

Mr. Miller argues that the District Court erred in entering summary judgment in favor of Officer Harget on his claim that his Fourth Amendment rights were violated. He contends that Officer Harget effectuated a traffic stop in pulling up behind the parked Best vehicle and approaching him. He argues that the detention was not supported by reasonable suspicion because he did not in fact

---

[3]Mr. Miller does not appeal the District Court's ruling with regard to his Sixth and Fourteenth Amendment claims.

commit a traffic code violation. Mr. Miller maintains that the District Court erred in granting summary judgment in favor of Officer Harget and the City because he demonstrated that there are genuine issues of material fact in dispute regarding whether he committed any traffic violation.

In contending that the detention and arrest of Mr. Miller were valid, Officer Harget posits that Mr. Miller cannot "create a factual dispute by simply denying everything." Accordingly, he asks us to disregard certain portions of Mr. Miller's testimony that seem to conflict with Officer Harget's. The District Court accepted this theory, relying on *Johnson v. Crooks*, 326 F.3d 995 (8th Cir. 2003). We review the decision of a district court *de novo.* Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Lippert v. Cmty. Bank, Inc.*, 438 F.3d 1275, 1278 (11th Cir. 2006). We decline to adopt today the Eighth Circuit's rule in *Johnson*. We can affirm anyway and need not worry much about *Johnson*.

Even if the district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices. *See, e.g.*, *Bischoff v. Osceola County*, 222 F.3d 874, 876 (11th Cir. 2000) (holding that in a § 1983 action against the county and sheriff, it was error for the district court to resolve factual dispute and make credibility choices

on material issues just by relying on reading of warring affidavits); *Harris v. Ostrout*, 65 F.3d 912, 916-17 (11th Cir. 1995) (holding that in a § 1983 action against prison officials, affidavits by fellow inmates created a triable issue of fact precluding summary judgment); *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986) (holding that where defendants' affidavits directly contradicted prison officers' version of events, there was a "square, head-on dispute of material facts" precluding summary judgment).

Mr. Miller's affidavits and deposition squarely contradict Officer Harget's version of the events. In his affidavit, Officer Harget contends that he based his decision to arrest Mr. Miller for driving under the influence of alcohol on the following facts: (1) his failure to maintain his lane of traffic; (2) his failure to signal when turning into the parking lot of the HomeTown Inn; (3) the odor of alcohol coming from within the vehicle and from Mr. Miller; (4) Mr. Miller's bloodshot glassy eyes; (5) Mr. Miller's admission that he consumed alcohol; (6) Mr. Miller's uncoordinated mannerisms and that he dropped some documents while exiting the vehicle; (7) the presence of the non-translucent white cup containing what Officer Harget believed to be alcohol; and (8) Mr. Miller's refusal to take breathalyzer tests.

Mr. Miller testified that he did not violate any traffic laws. He testified that he had not been drinking. He alleged in an affidavit that there was no irregularity to his mannerisms or speech, that he was not uncoordinated, and that he did not have any problems standing, talking, or hearing. Although he could not state what his eyes looked like because he did not look in a mirror, he testified that he did not have any problems with his vision. Mr. Miller further testified that he did not admit to Officer Harget that he had been drinking. He denied that there was a non-translucent white cup in his car containing alcohol.

Officer Harget is correct in arguing that Mr. Miller's subsequent acquittal is not determinative of whether Officer Harget had reasonable suspicion or probable cause. "The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted–indeed, for every suspect released." *Baker v. McCollan*, 443 U.S. 137, 145 (1979). But Mr. Miller's acquittal and the evidence adduced at that trial, which is included in the record on appeal, demonstrates that there may be a factual dispute regarding Officer Harget's reasonable suspicion that Mr. Miller committed traffic violations.

**B**

We may affirm the District Court on any basis supported by the record. *Williams v. BellSouth Telecomm., Inc.*, 373 F.3d 1132, 1139 (11th Cir. 2004). The District Court concluded that Mr. Miller was seized, for Fourth Amendment purposes, when "the officer approached the vehicle, smelled alcohol, and observed the Plaintiff's appearance." Prior to that, the District Court concluded that "there was no detention of the Plaintiff." We agree.

In *United States v. Perez*, 443 F.3d 772 (11th Cir. 2006), this Court explained that there are three types of encounters between police and citizens "for purposes of . . . Fourth Amendment analysis: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." *Id.* at 777 (citing *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989)). This Court noted that an encounter that does not involve coercion or detention "does not implicate Fourth Amendment scrutiny." *Id.* (quoting *United States v. Espinosa-Guerra*, 805 F.2d 1502, 1506 (11th Cir. 1986)). Officers are free, without any level of suspicion, to approach citizens on the street or in a public place and ask them questions, request proof of identification, and a consent to search. *Id.*; *see also Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion) ("law enforcement officers do not violate the

12

Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions"). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." *Perez*, 443 F.3d at 777-78 (emphasis omitted) (quoting *United States v. Drayton*, 536 U.S. 194, 200-01 (2002)); *see also United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (Stewart, J.) (articulating "free to leave" test). In determining whether a "reasonable person would feel free to terminate the encounter," courts consider several factors: "whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police." *Perez*, 443 F.3d at 778 (quoting *United States v. De La Rosa*, 922 F.2d 675, 678 (11th Cir. 1991)).

This Court has decided on several occasions that a police officer does not seize an individual merely by approaching a person in a parked car. *See United States v. Baker*, 290 F.3d 1276, 1277 (11th Cir. 2002) (officer approached vehicle

13

stopped in traffic), *De La Rosa*, 922 F.2d at 677 (officer approached individual as

he walked away from a parked car); *United States v. Thompson*, 712 F.2d 1356,

1358 (1983) (officer approached individual sitting in parked car). Here, the time

that preceded Officer Harget's arrival at the driver's side of the Best vehicle was

extremely brief. Before Mr. Miller voluntarily lowered the window, Officer

Harget did not do anything that would appear coercive to a reasonable person. For

example, he did not draw his gun, give any directions to Mr. Miller, or activate his

roof lights.

Mr. Miller contends that he was detained or seized when Officer Harget

parked behind him. We disagree. The record shows that Mr. Miller intended to

walk to his room after voluntarily parking the car. It is not dispositive that Officer

Harget would have prevented Mr. Miller from backing Ms. Best's car out of the

parking space. In *De La Rosa*, two police officers in unmarked cars followed Mr.

De La Rosa as he

> proceeded to his apartment across the street and used a
> special pass in order to open a security gate into the
> parking lot. Before the gate closed, one of the police
> officers . . . entered the complex. After [Mr. De La
> Rosa] parked and began walking toward his apartment,
> [the officer] positioned his unmarked police car directly
> behind [Mr. De La Rosa's] vehicle, approached [Mr. De
> La Rosa], identified himself as a police officer, and
> asked [Mr. De La Rosa] if he could speak with him.

14

*De La Rosa*, 922 F.2d at 677. This Court concluded in *De La Rosa* that no seizure had occurred. *Id.* at 678. In the instant matter, Mr. Miller did not demonstrate that he had any intent to back out of the parking space when Officer Harget pulled up behind him.

The fact that Officer Harget turned on his "window lights," in addition to parking behind the Best vehicle, does not necessarily make his approach of Mr. Miller a coerced detention. In *United States v. Dockter*, 58 F.3d 1284 (8th Cir. 1995), a police officer "pulled his vehicle behind [the defendants'] parked car and activated his amber warning lights." *Id.* at 1287. The court concluded that "[t]here was no behavior by the officer that would differentiate this encounter from one where an officer approaches a stranded motorist to offer assistance." *Id.* In this case, Officer Harget testified that he initiated his lights so that Mr. Miller would know that he was there. *See also Perez*, 443 F.3d at 778 (concluding that when, among other things, police officer "briefly flashed his blue lights, but only to identify himself as a police officer because he arrived at the scene in an unmarked car," no detention occurred).

Briefly stated, the ultimate inquiry is whether Officer Harget's initiation of his lights and placement of his vehicle exhibited coercion that would make Mr. Miller feel he was not free to leave. Neither of these facts by itself is dispositive:

rather, we consider them in light of the totality of the circumstances. *See Perez*,

443 F.3d at 778. Considering the fact that the first contact between Mr. Miller and

Officer Harget did not occur until Mr. Miller lowered the window, the fact that

Officer Harget pulled up behind Mr. Miller and turned on his "window lights"

does not demonstrate that Mr. Miller was coercively detained. "On this record,

viewing the totality of the circumstances, there was no 'show of authority that

communicate[d] to the individual that his liberty [was] restrained, meaning he

[was] not free to leave." *Perez*, 443 F.3d at 778 (quoting *Baker*, 290 F.3d at

1278)).[4]

**B**

---

[4]It is irrelevant whether Officer Harget intended to detain Mr. Miller when he parked his patrol car behind the Best vehicle, flashed his lights, and approached the driver's side window. As Professor LaFave has explained:

> In exploring the meaning of the [free-to-leave] standard, certainly the first matter deserving of attention is the emphatic statement that the uncommunicated intention of the officer is not determinative. . . . []The objective nature of the test also means that whether an encounter has become a seizure "depends on the officer's objective behavior, not any subjective suspicion of criminal activity"; in other words, it is *not* the case that an "officer can engage in a consensual encounter only with citizens whom he does not suspect of wrongdoing."[]

4 Wayne LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.4(a), at 413-14 (4th ed. 2004) (quoting *United States v. Waldon*, 206 F.3d 597 (6th Cir. 2000)); *see also Brower v. County of Inyo*, 489 U.S. 593, 596-597 (1989) ("a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement . . . , nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement . . . , but only when there is a governmental termination of freedom of movement *through means intentionally applied.*");

16

Although Officer Harget did not seize Mr. Miller simply by parking behind the Best vehicle and approaching it on foot, it is clear that Officer Harget did detain him after smelling alcohol in the vehicle. *See Perez*, 443 F.3d at 777 (discussing different types of seizures under the Fourth Amendment). A detention is reasonable under the Fourth Amendment if "the officer's action is supported by reasonable suspicion to believe criminal activity 'may be afoot.'" *Arvizu*, 534 U.S. at 273 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). To determine if an officer had reasonable suspicion, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417-418 (1981)). Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (quoting *Cortez*, 449 U.S. at 418); *see also Thompson*, 712 F.2d at 1361 (stating that reasonable suspicion is based on "articulable and specific facts known to [the officer] when the seizure occurred").

Mr. Miller argues that a genuine issue of material fact exists with regard to whether he violated the traffic laws. While that may be true, it is undisputed that Officer Harget smelled alcohol when Mr. Miller lowered the window. It is also

17

undisputed that one occupant of the car, Ms. Best, had been drinking. Because Mr. Miller was the driver of the vehicle, and may have consumed alcohol, Officer Harget was justified in detaining him to determine whether he had been driving under the influence of alcohol. Under these circumstances, a prudent officer could question the driver and ask the driver to take a breathalyzer test. *See, e.g., Arvizu*, 534 U.S. at 277 (stating that an officer "need not rule out the possibility of innocent conduct" in order for reasonable suspicion to exist) (citing *Illinois v. Wardlaw*, 528 U.S. 119, 125 (2000)). Therefore, when Officer Harget smelled alcohol coming from the vehicle Mr. Miller had been driving, he had reasonable suspicion to detain Mr. Miller in order to investigate.

## C

Arrests must be based on probable cause. "A warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim." *Kingsland*, 382 F.3d at 1226. Probable cause exists when "the facts and circumstances within the officers' knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) (quoting *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995)).

18

The record shows that Officer Harget had probable cause to arrest Mr. Miller after he completed the investigation triggered by reasonable suspicion that Mr. Miller was driving under the influence of alcohol. First, Officer Harget witnessed Mr. Miller driving. Second, Officer Harget smelled alcohol emanating from the interior of the vehicle when Mr. Miller lowered the window. Third, Mr. Miller refused to take a breathalyzer test.

Whether or not Officer Harget had probable cause to arrest Mr. Miller because the officer smelled alcohol coming from the vehicle, the officer did have reasonable suspicion. He reasonably detained Mr. Miller in order to investigate whether he had been driving under the influence. From this detention, probable cause developed, justifying Mr. Miller's arrest, because Mr. Miller refused to take a breathalyzer test.

A prudent officer could conclude from a refusal to take a test, coupled with the smell of alcohol, that the driver had in fact been drinking. *See Rankin*, 133 F.3d at 1435 (stating that test for probable cause is what a prudent officer would believe); *see also Long v. State*, 610 S.E.2d 74, 77 (Ga. Ct. App. 2004) (noting that evidence of a refusal to take a blood-alcohol test is admissible against a person charged with driving under the influence); Ga. Code Ann. § 40-5-67.1(b)(2) (giving notice to those who refuse to submit to a blood-alcohol test that

19

their refusal is admissible as evidence at trial). Submitting to a breathalyzer test is a minor inconvenience for a driver and an easy opportunity to end a detention before it matures into an arrest. Mr. Miller chose not to endure this minor inconvenience. It was reasonable for Officer Harget to view this choice as evidence of guilt. Any other conclusion would tie the hands of law enforcement in their efforts to keep intoxicated drivers off the streets. If a driver refused to submit to a test after an officer smelled alcohol, the officer would have no choice but to let him or her go, absent other evidence the driver had been drinking.

In this case, Officer Harget reasonably sought the information he needed to confirm whether Mr. Miller had been drinking. A driver cannot escape arrest simply by refusing to cooperate. We therefore conclude that Mr. Miller's refusal to take a breathalyzer test, coupled with the smell of alcohol from the vehicle, gave Officer Harget probable cause to arrest him. This conclusion is consistent with *Summers v. State of Utah*, 927 F.2d 1165 (10th Cir.1991), in which the Tenth Circuit wrote: "The undisputed facts regarding plaintiff's operation of his vehicle, the officer's scent of alcohol emanating from the vehicle and plaintiff's refusal to

take a field sobriety test substantiate the . . . conclusion" that the officer had probable cause. *Id.* at 1166.[5]

## III

Mr. Miller argues that Officer Harget stopped him because he is African-American and with an intent to harass him, not because he was suspected of criminal activity. It is well-settled that an officer's subjective motivations do not affect whether probable cause existed. *Whren v. United States*, 517 U.S. 806, 813 (1996) (concluding that subjective motivations are irrelevant with regard to validity of a traffic stop); *Arkansas v. Sullivan*, 532 U.S. 769, 771-772 (2001) (concluding that subjective motivations are irrelevant with regard to validity of an arrest); *Durruthy v. Pastor*, 351 F.3d 1080, 1088 n.5 (11th Cir. 2003) ("[t]here is no question that an officer's subjective intent is immaterial when there is an objectively reasonable basis for believing that an offense has occurred").[6]

---

[5]It is also undisputed that Mr. Miller dropped papers while exiting the vehicle. Officer Harget interpreted this as evidence of intoxication. We need not discuss the reasonableness of this inference as it relates to a determination of probable cause because we conclude that the fact that Mr. Miller was driving a vehicle, an odor of alcohol emanated from its interior, and his refusal to submit to a field sobriety test was sufficient to give Officer Harget probable cause to arrest. We also need not reach the question whether Officer Harget had probable cause to arrest Mr. Miller based on his failure to provide proof of insurance.

[6]Mr. Miller does not argue that Officer Harget violated his right to equal protection.

21

We conclude that Mr. Miller has failed to produce evidence creating a genuine issue of material fact with regard to his Fourth Amendment claim. No detention or seizure of Mr. Miller occurred until he lowered the window of his vehicle and Officer Harget smelled alcohol. The smell of alcohol was sufficient to give Officer Harget reasonable suspicion that Mr. Miller had been driving under the influence of alcohol. As Officer Harget engaged in a reasonable investigation, including requesting that Mr. Miller submit to a breathalyzer test, Mr. Miller refused to cooperate. This refusal gave Officer Harget probable cause to arrest Mr. Miller.

### IV

Mr. Miller next argues that the City is liable for a violation of his Fourth Amendment rights. Because Mr. Miller has failed to establish that his constitutional rights were violated, he has necessarily failed to establish the City's liability. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (concluding that when no constitutional violation is demonstrated, there is no basis for which to hold municipality liable).

### V

Finally, Mr. Miller argues that the District Court erred in entering summary judgment in favor of Officer Harget and the City on his state law claims of false

imprisonment, false arrest and malicious prosecution.  Each of these claims requires a showing that the defendant acted without probable cause.  *Adams v. Carlisle*, __ S.E.2d__, 2006 WL 1390593, at * 3-4 (Ga. Ct. App. 2006).  Because we have concluded that Officer Harget had probable cause to arrest Mr. Miller, Mr. Miller's state law claims also fail.

**AFFIRMED.**